NORTH (YALE & GREENLEAF MANUF'G CO. v.). See Case No. 18,123.

NORTH, The CHRISTOPHER. See Case No. 2,707.

NORTHAM, The C. H. See Cases Nos. 2,689 and 2,690.

NORTHAM (PHILADELPHIA & R. R. CO. v.). See Case No. 11,090.

NORTHAM (PRATT v.). See Case No. 11,376.

## Case No. 10,313.

### The NORTH AMERICA.

Superior Court, S. D. Florida. Dec. 13, 1842.

Court of Appeals, Territory of Florida. Feb. 1, 1843.

SALVAGE — COMPENSATION — ATTACHMENT OF VESSEL AND CARGO—APPLICATION OF MASTER FOR RESTORATION—EMBEZZLEMENT BY MASTER.

[1. Four vessels and 59 salvors saved $965 in specie, and cargo and materials valued at $4,589.59, from a vessel wrecked on the Florida reef. *Held*, that they should be allowed 45 per cent. upon the net balance after deducting costs and charges.]

[2. When a vessel and cargo are attached in admiralty, at the suit of salvors and others, at a place distant from the residence of the owners, and the master intervenes, and claims the restoration to him of the property, or its proceeds, as the agent in law of the owners and others interested in the property, and it appears that he has been guilty of embezzlement of any of the cargo, or has fraudulently colluded with salvors, or has barratrously run his vessel ashore, or has done, or omitted to do, any other act, indicating a reckless depravity or fraudulent intent, inconsistent with his duty and the safety of the property confided to his care, the court should withhold from him the property under its control.]

[3. A box containing $10,000 in gold was on board when the vessel struck a reef, but was not in the cargo saved by the salvors, who made strenuous efforts to find it after the loss was discovered, and before they left the wreck. The master did not at any time show a due amount of anxiety as to its loss or its recovery. He made no charges against any person, but denied all knowledge in respect to it, and stated that he neither had it, nor knew where it was. The salvors proved themselves innocent of the charge of theft. *Held* (reversing the decision of the superior court) that, while the facts raised a suspicion of fraud by the master, they were not sufficiently conclusive to justify withholding from him the residue of the proceeds after deducting salvage.]

[Libel in rem by George W. Carey and others against the cargo and materials of the ship North America, for salvage.]

W. R. Hackley, for libellants.
Adam Gordon, for respondent.

MARVIN. District Judge.   This suit is instituted by the libellants against the cargo and materials of the ship North America, for the recovery of salvage. The ship was wrecked on the Florida reef on the night of 26th of November, and the hull totally lost. The cargo and materials were saved by the libellants. It appears that the ship was bound on a voyage from New York to New Orleans and first struck upon the Bahama banks, where she lost her rudder. All the passengers but one were there transshipped on board of another vessel bound to this port. The ship was gotten off, and, a temporary rudder being constructed. she proceeded on her voyage, and on the night of the 23d struck upon the Florida reef. Assistance was offered to Captain Hall, to get his ship off, on the morning of the 24th, but refused, he endeavoring to press his ship off the rocks by the force of his sails.   On the night of the 26th the ship bilged, and the libellants were employed to save the cargo and materials. With considerable labor, they succeeded in saving the entire cargo, except a few casks of coal, and the apparel and furniture of the ship. The cargo and materials have been sold for the sum of $4,589.59. There was a box of specie saved, containing the sum of $965, making in the aggregate the sum of $5,554.59. The wharfage, storage, bills for labor in landing and storing the cargo, and the costs and expenses of this suit, will make a considerable item to be first deducted from the amount. There were four vessels and fifty-nine men employ-

ed in saving the property, among whom the salvage is to be distributed. It is not common for the courts to decree the same rate of salvage upon money, jewels. &c., as upon other property, they being light and portable articles of great value, and easily saved; but as they contribute when a part of the cargo, the same as other property, in adjusting an average, it can make no difference, in the present case, whether I decree a specific rate of salvage upon the specie, or decree the salvage upon the aggregate amount. I think, therefore, that forty-five per cent. upon the net balance after deducting the above charges will be a reasonable salvage.

The question of the amount of salvage being thus disposed of, the only remaining question is the claim interposed by Captain Hall, to have the residue of the proceeds of the cargo and materials paid to him, as master of the ship, and, as such. the agent in law of the persons interested.   Before considering the question of law arising upon this claim a statement of facts appears to be necessary, in order to show how the question arises. The facts appear to be these:   The ship had on board, as freight, when she left New York and when she struck upon the Florida reef, two boxes of specie,—the one containing $965 in silver, which was saved. and is now in the custody of the marshal; the other containing, as the master was informed, $10,000 in gold. The box of gold is missing. The master, in answer to interrogatories propounded to him by the salvors, described the box as being about eight inches square, iron bound, and sealed. He presumes it was on board the night the wreckers commenced discharging the ship on the reef, but does not know where it now is, and has not seen it, or any part of its contents, since his arrival in this port. After the passengers had left the ship on the Bahama banks, the two boxes of specie were stowed, by the direction of the master, together in the run of the ship. The mates both testify that since they thus stowed them they have seen nothing of the box of gold, and do not know what has become of it.   When the wreckers commenced discharging the ship, the second mate went into the hold, to keep watch of the money, and the cargo generally.   When they had been at work about an hour in removing cargo on deck, one of the wreckers was sent into the hold to bring up the boxes of money. The second mate joined him in the hold, and they went together to the place where they had been stowed, and found the box of silver, but the box of gold was not found.   The wreckers then searched the hold of the vessel and deck thoroughly, with an avidity made keen by the hope of acquiring salvage upon the money. The Eliza Catherine, one of the wrecking sloops, then lying alongside, but having. as yet, taken in no cargo, was also searched by the first mate of the ship. The box had evidently been removed, and was now nowhere to be found.   Captain

Johnson testified that he was stationed at the after hatch, on the middle deck, through which the greater part of the cargo was hoisted, and through which the missing box would naturally come, during the whole period of discharging the ship. His business was to bear off and direct the course of the packages as they were hoisted on deck. He swears positively that no such box as the missing one passed through that hatch while the ship was discharging. Cortlandt Williams was in like manner stationed at the middle hatch, through which a part of the cargo was passed, from the time the wreckers commenced work until the box was missed, and, with the exception of a minute or two, until the ship was discharged. He saw no such box. No other hatches were open. The first mate of the ship testifies that it was his business to keep and take an account of the boxes and other articles taken from the ship and laden on board the wrecking vessels, and that the box in question was not passed on board any of the vessels while he was thus employed. He was absent from this duty but for a short time, when the second mate supplied his place. The second mate testifies that, while he was thus occupied in supplying the place of the first mate in taking such account, the box in question was not passed on board any of the wrecking vessels. All this testimony is uncontradicted and its force unaffected by any explanations.

The master of the ship does not charge any of the salvors, either by a particular or a general charge, with having taken the box; nor, so far as appears, does he charge any of his own crew, or the passengers on board, with having abstracted it. He simply declares that it was on board, but is now lost. So far as any investigation has progressed in this court in regard to its loss, he seems to be interested only when its embezzlement is indirectly imputed to himself, and seems to take no interest in its recovery. Had the box in question been really embezzled by any of the wreckers or his own crew, it could have easily been recovered by instituting the necessary searches before the wrecking vessels had communicated with the shore. Again, had any of the salvors embezzled it, and Captain Hall had so charged, and produced prima facie proof of it, although he might not be able to point out the particular guilty one, no salvage would have been decreed until the box was forthcoming, and the powers of this court would have been employed in every practicable manner to have obtained its restoration. But there is not the shadow of any proof that any of the salvors have been concerned in the abstraction; on the contrary, fearing, from their situation and the nature of their employment that the court might suspect them of embezzling it, they have themselves, without being accused, effectually proved themselves innocent. From the whole testimony, the following facts, I think,

are clear: The box was on board when the ship struck the Florida reef. It was not left on board when the ship was abandoned. It was not removed by any of the wreckers, or, if removed by any wrecker, it was removed with the knowledge of, and by collusion with, Captain Hall, and without the knowledge of the wreckers generally. The idea that Captain Hall has secured and concealed this money with the view to avoid the recovery of salvage on it, and intends to return it to the owners, is plausible, and at least charitable, compared with the idea that he has embezzled it. But the motive of saving to the owners a few dollars in salvage does not seem adequate to induce the commission of a fraud upon innocent persons, who have but just rendered him an important service while in distress. Nor does this idea accord with his own depositions under oath, and his declaration that it is lost. To near now to the point: The question is whether it be the duty of the court, under these circumstances, to restore the proceeds of the cargo and materials to Captain Hall, on the ground of his being the master of the ship, and as such the agent of whoever may be interested, and therefore entitled to receive them.

The authority of the master of a ship, in the course of a voyage, is, under ordinary circumstances, confined to the command and navigation of the vessel, and the transportation of the cargo. But it is considered that, under circumstances of emergency or necessity, he acquires a superinduced authority, and acts as the agent and representative of all persons interested; and his acts done in good faith, and in the exercise of a fair discretion, are binding upon the persons he represents. He may, in the course of a voyage, throw overboard the cargo, or any part of it, in a case of necessity, for the preservation of the ship or residue. If driven into a port of necessity he may sell the cargo, if perishable. So he may sell a part of the cargo, or hypothecate the ship, cargo, and freight, for repairs, the payment of salvage, or ransom, to enable him to perform the voyage. So, in a case of urgent necessity, he may sell the ship. He may prosecute in his own name suits for injuries done to the ship or cargo, and may appear, defend, and interpose claims in all suits instituted against the ship and cargo. In short, his powers seem adequate to any occasion for the preservation of the ship and cargo. In this court, his authority to appear and defend the ship and cargo against claims of salvage, and to receive their proceeds when sold, has been constantly recognized and acted upon, with but few exceptions, hereafter noted. But these extraordinary powers are conferred upon the master, not for his advantage, but the owners'; not to enable him to destroy, lose, make money out of, or embezzle, the cargo, or any part of it, but to preserve and safely keep

it for the owners. If he become incapable of properly exerting his authority, or exert it in direct hostility to the interests of the owners of the property committed to his charge. the end for which it is conferred is defeated, and instead of being the preserver he becomes the destroyer. Suppose that in the progress of a voyage the ship be wrecked, and the cargo and materials be saved, and brought into some intermediate port, and attached, libelled, and sold for salvage, and the master appear and claim, as the agent of the absent owners, the residue of the proceeds of the sale after payment of salvage, and, in the progress of the examination of the claim of salvage, it satisfactorily appear to the court that the wreck of the ship was produced by the voluntary and barratrous act of the master, or that he had colluded with the salvors to increase the amount of their salvage, or had accepted gifts and gratuties from them to abandon the property to an exorbitant claim of salvage, or had been detected in making large embezzlements of the cargo, or had been gui ty of any other gross fraud or dereliction of duty, or had suddenly become insane, or, neglecting his duties, had remained for weeks stultified and stupefied with liquor, or had otherwise become unfit to have the charge of large amounts of money; can it be pretended that, in these and like cases, it is not the duty of the court, upon its own mere motion, to refuse to restore the proceeds of the cargo and materials to the master, and to take measures to secure them to the persons interested? Shall the court, because he is clothed with authority to receive the proceeds for their safety and preservation, and for the use of the persons interested, recognize his authority as binding on it, when a strong presumption arises that, if once possessed of them, he will lose, squander or embezzle them? I think the true rule to be adopted in such cases is that when the circumstances are such that. if known to the owners of the property, they would unhesitatingly revoke the master's authority, the court is bound, in justice to them, to regard his authority as revoked, and treat it accordingly. It appears to me that a position so just, and in this court so necessary to be maintained, in order to protect the interests of shippers residing in distant and foreign countries, needs not to be fortified by authority cited from the text-books or reported cases. It is conceded that it would be difficult to procure such authorities. The question has probably never arisen in any court but this, as no other court within my knowledge is situated as this is. But it has arisen twice in this court within a few years. In the case of The Isabel [Case No. 7,098], decided in 1840, this court refused to restore to the master the proceeds of the sale of the brig and cargo, although the brig and cargo both belonged to foreigners. In that case the court was satisfied from the evidence before it that the brig had been voluntarily wrecked by the master, and that the strong inducement to that act was the possession of the very proceeds in question. The proceeus were subsequently paid to the owners, on proof of their interest. In the case of The Pequot [unreported] the proceeds of the sale of the cargo were in like manner withheld from the master, the circumstances of the case being such as to induce a strong presumption that the loss of the vessel was the result of a preconcerted arrangement. If the position above assumed be sound, then I know of no court in which it ought to be more inflexibly adhered to than this, when I consider the large amount of property annually shipwrecked on this coast, and brought within its jurisdiction by suits for salvage and recur to repeated instances of the barratry of masters; their collusion with the wreckers, and other persons whose interests are antipodal to the interests of the owners of the property committed to their charge; their gross frauds and derelictions of duty,— I think it peculiarly incumbent on this court to exercise its full powers, and to watch over, and guard with its panoply, the interests of the betrayed and unknown owners. I cannot doubt that the present case is within the rule above laid down, and that the owners, if they knew the circumstances, would unhesitatingly revoke the master's authority. Of course, the master's claim to receive the proceeds of the sale of the cargo and materials must be disallowed. The proceeds must be paid only to the owners, or their agent appointed to receive them.

[From the decree of the superior court, Hall, master, appealed to the court of appeals of the territory of Florida, where the following opinion was delivered:]

BRONSON, District Judge. This cause comes to this court on an appeal from the decree of the superior court of the Southern district, sitting in admiralty. The original cause in the court below was instituted by a libel for salvage. The ship North America (Hall, master), bound from New York to Mobile, on the 23d November, 1842, ran ashore upon the Florida reef, where she remained until the night of the 26th November, when she bilged, and was finally lost. George W. Carey and his associates, licensed wreckers of Key West, saved the cargo and materials of the ship, and brought them into that port, and libelled and attached them for salvage. Hall, the master of the ship, appeared on behalf of the absent owners, and answered the libel, and claimed, in his capacity of master, the surplus of the proceeds of the sale of the property saved after payment of the salvage. The superior court decreed salvage to the libellants, but refused to restore the residue of the proceeds to Captain Hall, and ordered "that the claim of G. S. Hall to have the

residue of said proceeds and specie restored to him be disallowed, and that the same be kept deposited with the clerk of this court until further order, and that the clerk cause a notice to be published in one of the commercial newspapers printed at Mobile, advising all persons interested in said proceeds to present their claims and make proof of their interest to this court without delay, and as they may be advised." It is from this portion of the decree that Captain Hall appeals, and now asks of this court to decree to him, for the benefit of the owners, or whoever may be interested, the residue of the proceeds withheld from him by the decree of the superior court.

It appears that, when the ship North America struck on the reef where she was lost, she had on board two boxes of specie, one containing about $965 in silver, and the other said to contain $10,000 in gold. The box of silver was saved by the wreckers, but the box of gold was nowhere to be found; it was lost or missing, and neither the captain nor the sailors can give any account of it. The salvors, in their libel (with the view either of claiming salvage on this gold, or perhaps to exculpate themselves in advance from any suspicions which might rest upon them in relation to it), allege that they were not able to find this box of gold, that it never came to their possession, and that they have no knowledge of it; and they charge that Captain Hall himself either had taken the box, or knew where it was, and they propound to him certain interrogatories on that subject. These interrogatories were badly or inartificially drawn, and evasively answered, but Captain Hall, both in his answer to the libel and the interrogatories, denies all knowledge of the box, and says, in substance, that he neither has it, nor knows where it is, but makes no charges against any person in respect to it. He admits that the box was on board, and stowed in the run of the ship, when she struck on the reef. Much evidence was given on this subject in the court below, and although the trial or hearing of a cause in admiralty on appeal is de novo, and new allegations may be made and new proofs adduced, yet the hearing in this court has been had on substantially the same allegations and proofs as in the superior court. It is unnecessary, however, now to detail this evidence more particularly, but for the present it is sufficient to say that the proofs were such in the court below as to satisfy the judge there that no blame or suspicion attached to the salvors; but he also came to the conclusion that Captain Hall himself had either embezzled the box, or disposed of it with some fraudulent intent towards the owners or underwriters, and, acting upon that supposition, he refused to restore to him the proceeds in question. In the opinion pronounced in the court below the judge laid down the rule that where a vessel or cargo is libelled at some intermediate port on its voyage, and on the hearing

(the captain having intervened, and claimed the restoration of the ship or cargo or residue) facts and circumstances are disclosed in relation to the master's misconduct which, if known to the owners, would induce them unhesitatingly to revoke his authority, then the court is bound, in justice to them, to consider his authority as revoked, and to treat it accordingly.

Without giving an unqualified assent to the rule thus laid down, this court have no hesitation in saying that when a vessel and cargo are attached in admiralty, at the suit of salvors or others, at a place distant from the residence of the owners, and the master intervenes, and claims their restoration to him, or the restoration of the proceeds, as the agent in law of the owners and others interested in the property, and it appears in evidence that he has been guilty of an embezzlement of any of the cargo, or has fraudulently colluded with salvors, or has barratrously run his vessel ashore, or has done, or omitted to do, any other act, in relation to the property under his care, involving gross violation of his duty, and not originating in ignorance, mistake, or error, but indicating a reckless depravity or fraudulent intent, inconsistent with his duty and the safety of the property confided to his care, the court may and ought to withhold from him the property under its control.

There can be no doubt that under circumstances of emergency or necessity the master of a vessel acquires a superinduced authority or agency over the vessel and cargo fully adequate to such emergency or necessity, and, in the absence of the owner or supercargo, he is vested by law with every power and authority for their safety and preservation. He may in his own name prosecute suits for injuries done to either the vessel or the cargo while under his care, and may appear—and indeed it is his duty to appear—and defend all suits instituted against either, and claim their restoration to him for the benefit of the persons interested. He may also adjust average, and do many other things in behalf of the owners of the ship and cargo requiring very plenary powers and large authority, and indeed he has a special or qualified interest in the property under his care that is valid as against all the world except the true owner. Whether this authority over or qualified interest in the ship and cargo be deemed to be vested in him by operation of law, as necessary to enable him fully to protect the property and accomplish the purposes of the voyage, or as conferred upon him by the express or implied assent of the owners of the ship and cargo for the like purposes, is immaterial; the intent or purpose for which this power and authority or interest is given or deemed to be conferred is still the same,—it is to enable him to preserve the ship and cargo for the benefit of all concerned, and bring his voyage to a successful termination. If, then, instead of exerting his

authority with the view to accomplish the end for which it was given, he fraudulently exerts it to defeat that very end,—if he willfully attempts to destroy the property under his care, or delivers it up to pirates or marauders, or corruptly colludes with salvors, and conspires ·with them to abandon the defense of the property, and, by fraud upon the court, to obtain a judicial sanction of an unwarrantable amount of salvage, or if he otherwise traitorously abandons the interests of those whose agent he is in law, and basely attempts to cheat and defraud them of their property, or permits it to be done,—the end for which his authority is given or agency conferred is defeated. Such acts amount to an abandonment of his agency, and in such cases the same law which, ex necessitate, confers the authority upon the master. or recognizes the existence of it as derived from the assent of the owners, abrogates and supersedes it.

The right of an admiralty court to withhold from a master on its own motion, the proceeds of his ship and cargo, and to treat his authority as superseded, under the circumstances above indicated, by no means implies the right of the judge to turn knight errant in defense of the rights and interests of the commercial world, or travel out of his appropriate sphere, and go on a voyage of philanthropy, to seek for wrongs and injuries to be redressed, or to constitute himself the unsolicited avenger of every act of fraud and knavery committed within his jurisdiction or upon the high seas; but the doctrine above advanced merely requires of him a very simple and obvious duty in respect to property of absent owners which may be brought into court, and if the parties to such knavery, or any of them, come into a court of admiralty as parties litigant, and if the property which is the subject-matter of such fraud is brought within the immediate jurisdiction of admiralty judge by attachment, and suit properly instituted, the court then becomes the custodian of such property, and as such is bound to see that it is not delivered up to knaves and harpies whose only object is to defraud the true owners, and whose only motive in committing the fraudulent acts which called into exercise the jurisdiction of the court may have been to acquire the possession of the very property in question, or the proceeds of it, by a judicial sanction obtained by fraud and imposition, and although this case. and the rule now laid down as applicable to such cases, may be without precedent and unheard of in admiralty jurisprudence, yet the principle is by no means without authority, and, if it were, still the reason of the rule which this court are disposed to adopt is founded so deep in the immutable principles of justice—in the dictates of common honesty as well as the promptings of common sense—that no reasonable hesitation could be indulged in. The case of U. S. v. La Jeune Eugenie [Case No. 15,551], and particularly the opinion of the judge in that case, page 460, plainly recognizes and sanctions the principle above laid down, and the right of the court, under such circumstances, to retain the proceeds for the true owners.

It is conceded that in the ordinary course of proceedings, when the libel is dismissed, or the libellants' claim is satisfied, a decree of restitution to the claimant, on proof of his interest, naturally follows; and it is equally true that when this plain course of proceedings is departed from the court becomes involved in difficulties and embarrassments of a delicate and responsible character. ˎ

In the present case, Captain Hall claims that the residue of the proceeds in question. which, in contemplation of law, have followed the appeal to this court, should be restored to him. No person appears to resist his claim. Apparently (as is said), it is a suit without parties, and but for the consent of Captain Hall the hearing would have been simply on the libel and answer. and without proof, and, if he himself had not adduced before this court the testimony taken in the court below, there would have been no evidence of the abstraction of the box of gold, and the proceeds might well have been restored to him without argument. Thus far the persons really interested have not appeared in this matter, and, in its efforts to preserve these proceeds for the true owners, the court is brought to appear as a kind of party to a proceeding pending before it; but this is by no means a proceeding so anomolous as has been supposed; a court of equity may be, and frequently is, in the same situation,—particularly when an ex parte application is made for a fund in court by a party claiming a right to it. but whose claim the court might believe to be founded in fraud or wrong.

Another inconvenience was strongly urged in the argument of this cause, which would result from a departure from the plain and ordinary course of proceeding, of restoring to the master the residue of the proceeds in court after payment of salvage, and other claims thereon. It was this: that when, as in the present case, there are various persons severally interested in the proceeds, and they are withheld from the master by the court, the labor and difficulty of adjusting and fixing the respective portions which each is entitled to receive is devolved upon the court. The court is converted into a sort of broker, to look up, examine, and adjust the various claims upon the proceeds. in the shape of commissions, wharfage. storage, labor, seamen's wages, notary public fees, and finally to adjust and fix the various items of expense chargeable to each shipper. or to adjust average. This, however, is an argument ab inconvenienti merely, and might have weight with an indolent judge.

or one who eschews labor or responsibility, but is by no means entitled to much consideration in determining the principle involved as to the power and duty of the court.

Nor have this court been inattentive to other considerations that were suggested in the argument at bar, as that the decree is not in conformity to the pleadings or issue, and the dangerous latitude to which such powers might be carried by corrupt judges, but notwithstanding all the seeming inconveniences and apparent inconsistency of the court's appearing as a kind of party to such a controversy, we are still of the opinion that it may and ought, in the cases before mentioned, to withhold the proceeds from the master. Suppose, in a case of salvage, the master and salvors collude to defraud the owners and underwriters, and this fact clearly appears on the hearing of the cause, it would be the duty of the court to amerce all the parties in costs and damages, refuse the salvage claimed, and preserve the property for the true owners. It would be asking too much of any court to allow itself to be used, and its records to be polluted, in working out a judicial sanction to the grossest iniquity and fraud, and when the fraud was detected, and the parties arrested in their proceedings towards its consummation, it would be singular justice indeed for the court to give up property in its custody to one of the parties in the transaction, when the court should know that such party claiming it had defrauded, or was endeavoring to defraud, the true owner of the very property in question. Still the active and unsolicited interference of a court of admiralty in cases brought before it is to be indulged in with great caution, and the facts and circumstances which call for its volunteer interference, should be very strong.

The ability and zeal with which this cause was argued by Captain Hall's counsel on the questions of law involved in it seem to call for this expression of the opinion of this court on the main question as to the powers and duty of the court below. It will be seen that, could we entertain the same opinion as that entertained by the judge of the court below in respect to the facts or the testimony touching Captain Hall's conduct, we should, in the main, concur with him. Looking at the record and the facts before this court, we do not think they warrant the conclusion that Captain Hall has embezzled this box of gold, or that he has been guilty of that gross fraud in relation to its safe-keeping which, upon the showing before us, would justify us in coming to the conclusion that he was morally unfit and disqualified to have the residue of proceeds restored to him, and that his authority should be considered as revoked. In short, without attempting to collate or compare or explain the testimony, we deem it sufficient to say that, though the facts proved may well raise a suspicion, yet they are not of a character sufficiently conclusive to justify the withholding the residue of the proceeds in question, and they must therefore be restored to him.

It is therefore ordered, adjudged, and decreed that the residue of the proceeds of the sale of the cargo and materials of the ship North America, now in the registry of the superior court for the Southern district, and subject to the order of this court, after deducting the costs and expenses of this suit, and the charges upon said proceeds allowed in said superior court, be paid to Captain G. S. Hall, master of said ship, for and on account of whom it may concern.